**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **STEPHANIE MERCIER, *et al.*** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 12-920C** |
| | ) | **Judge Kaplan** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' RESPONSE OPPOSING DEFENDANT'S MOTION FOR LEAVE TO RE-DEPOSE DEBORAH PLAGEMAN AND FOR COSTS**

Pursuant to Rule 7.2(a)(1) of the Rules of the United States Court of Federal Claims (RCFC), plaintiffs submit this response opposing defendant's August 4, 2017 motion for leave to re-depose Ms. Deborah Plageman ("Ms. Plageman") and for costs.

## BACKGROUND

The United States (the "VA") seeks leave to re-depose Ms. Plageman, whom it deposed in New York City on May 24, 2017, as to certain entries she had made in an errata sheet dated June 30, 2017. Plaintiffs had been willing to accommodate the VA in this regard, given that any re-opened deposition would be very short, and proposed in the recent status conference that the VA take additional testimony from Ms. Plageman by telephone. The VA, however, insists upon taking the deposition live in New York, with plaintiffs paying all costs and travel expenses for two attorneys. *See* Attachment A[1] to defendant's Motion for Leave to Re-Depose Deborah Plageman and For Costs (Doc. #117-1).

This matter has thus far been remarkably free of acrimony. Neither party has yet filed any motions to compel, and the parties have only sought limited Court participation in the

[1] Attachment A contains the parties' email exchanges regarding scheduling a second deposition for Ms. Plageman.

proceedings thus far. Given the VA's discovery abuse, plaintiffs are shocked by its insistence of re-deposing Ms. Plageman for minor changes made to her deposition errata sheet, and want to place this present dispute in context.

***Late Production of Documents Related to Class Issues.*** On February 4, 2016, plaintiffs served their First Set of Requests for Production of Documents (the "RFPs") on the VA. Among the RFPs, plaintiffs requested:

> 25. Produce all documents reflecting the log-in and/or log-out data for all advanced care nurses since January 1, 2006 in and/or out of the CPRS (whether on-site or remotely), or in and/or out of the VA's Citrix remote access system or any other computer program or application with a purpose or function to facilitate access to CPRS.
>
> 28. Produce all orders or documents, such as progress notes, consults, or discharge summaries, that contain the advanced care nurse's electronic signature for all named plaintiffs in the First Amended Complaint (Dkt. #56) and for all opt-in plaintiffs (prior to the date of service of these RFPD and Interrogatories).

RFPs, page 12-13. The VA responded some five months later, on June 27, 2015, stating that "Defendant is in the process of completing its review of all potentially responsive documents, all of which consist of electronically stored information. . . .[U]pon completion of this review, defendant will make its production." Defendant's Objections and Responses to Plaintiffs' First Set of Requests for Production of Documents, page 23 & 25. By email of November 4, 2016, counsel for the VA provided "a list of all documents produced to date that are responsive" to the RFPs, but the list identified no document that was responsive to Request No. 28, and only one that was partially responsive to Request No. 25.[2] The VA admitted as much in its reply memorandum in support of its motion for an extension of class discovery: "*as of the date of this*

[2] For the sake of brevity, plaintiffs have not attached these documents hereto, but will do so if the plaintiffs elect to file their own motion for costs and expenses.

*filing [June 30, 2017] plaintiffs are not yet in possession of any documents responsive to Request for Production 28*." *See* Doc. #110, page 4.

On July 12, 2017 – *after* the close of discovery on the class issue – the VA produced *over 30,000 additional documents* that were directly responsive to Request No. 28. These documents were logs of "notes" and "orders" that each of the named plaintiffs had electronically entered into the Computerized Patient Record System ("CPRS") since 2006.[3] The notes and orders detail down *to the second* when each plaintiff had made an electronic notation in the CPRS. The documents show with devastating detail the amount of work that plaintiffs had done beyond their scheduled tours of duty.

Most of these 30,000+ documents indicate that they had been searched for and actually printed in late March, 2016 – *some 15+ months before the VA actually produced them to plaintiffs.* The VA has explained its need for an extension of the class discovery period as follows:

> . . . we were *not* aware of the full scope of documents responsive to Request for Production 12 until May 10, 2017, when plaintiffs served their supplemental responses to our first set of interrogatories. In those responses, plaintiffs identified the specific "VA employees, representatives, or agents who expected,

[3] While an exemplar of an order/notes log would be instructive to the Court, the Court's April 15, 2016 Protective Order (Doc. #66) that is still in place limits filing documents that may include protected health information. Plaintiffs will therefore not include even a redacted copy of a page with this Response. However, they will make a redacted copy available to the Court via email for *in camera* purposes. The document is identified, and Bates stamped, as MER0050171, which is page 1 (of a 2027-page document) of the "notes/orders extract" for Jennifer Allred at Roseburg, Oregon. That document was originally generated on March 29, 2016, as clearly indicated on the document. The first entry of the document includes at mid-page the notation "^3111208.075351^." Ignoring the first "3", the notation means "2011 on December 08 at 07:53:51 military time," which is when Ms. Allred entered her first patient note. (Even on her first day on the job at Roseburg, Ms. Allred worked at least a half-hour of overtime.) The VA ran similar logs for each of the other named plaintiffs, all in late March 2016. Similar logs can apparently be generated for any Nurse Practitioner and Physician's Assistant (*i.e.*, all potential class members).

> required, or induced plaintiffs to work any time beyond their normal schedule work requirement to manage View Alerts or electronic patient health records." Those responses were the first instance when plaintiffs identified by name the specific VA employees who allegedly induced them to work overtime. Prior to receiving those responses, we were unaware of all individuals whose information had to be preserved, collected, searched and produced.
>
> * * * * * * *
>
> During the course of discovery, we learned of additional information that led us to question whether the initial set of search terms that we used to respond to plaintiffs first set of discovery requests was sufficient to capture all relevant information. As a result, we revised our search terms and located additional documents.

This explanation is a complete misrepresentation to the Court. A log of electronic entries into the CPRS is unambiguously responsive to RFP No. 28, regardless of whether a VA supervisor or the man in the moon induced a plaintiff to work off-the-clock. Nor did the VA find these reports only recently with new "search terms" – on their face the documents show that they were generated in late March 2016. Rather than providing these documents to plaintiffs, the VA instead sat on them, and *only produced them a full seventeen months after they had been requested*. The VA has no excuse for not producing notes and order logs (and View Alert logs) that were clearly responsive to the RFPs.

If these documents had been produced as required under the RCFC, then plaintiffs would have approached class discovery in a completely different manner. For starters, plaintiffs' counsel would have more clearly understood the database underlying the CPRS and the VA's computer system. Several of the depositions plaintiffs took would not have been necessary, including particularly those of Pam McClaran in Birmingham, and Thomas Jackson and Shannon Rhodes in Washington. Much of the information gathered in those depositions would have been self-evident from the note/order logs and the view alert logs. Plaintiffs could easily have discovered most of the other information provided by these deponents by interrogatories rifled at

the issue in question. Further, plaintiffs likely would have taken a different set of depositions, and certainly asked different questions as to the technical capacities of the CPRS and overall VistA database, if the logs in question had been produced in a timely manner.

In addition, giving copies of the notes/orders logs and view alert logs to plaintiffs certainly would have helped them in preparing for depositions, and in the depositions themselves. Plaintiffs are left to wonder if the responsive documents were intentionally withheld to preclude plaintiffs from reviewing them until after their depositions.

Plaintiffs have not previously raised this issue with the Court, nor sought to recover their unnecessary costs and expenses, because they want to move this case along. The Complaint was filed in 2012, and five years later, the parties have not yet even begun discovery on the merits. Plaintiffs anticipate filing a motion to certify the class in early September, but cannot do so while the VA continues to delay discovery.

***The Plageman Deposition.*** At page two of the present Motion, the VA categorizes the errata sheet into three general groups and enumerates twelve questions to explore further with Ms. Plageman. These questions are set forth below, with both the original and amended answers:

| **Item # - Transcript Citation** | **Question** | **Original Answer** | **Errata Sheet** |
|---|---|---|---|
| #1 – 30:20-31:4 | Why didn't you feel like you had the ability to ask that more acute patients be transferred to another provider's panel? | . . . Patients have the ability to request a change. Many of my patients have asked to stay in my panel, and I have developed relationships with them, and I felt that I would be abandoning my patients if I ... | *Answer was cut off by VA counsel interruption*. ". . . if I transferred them without giving them an opportunity to stay in my clinic." |
| #2 – 142:17-20 | Were you sending those emails prior to actually performing the work? | Sometimes, and sometimes after, because ... | *Answer was cut off by VA counsel interruption*. Complete answer: " . |

| | | | |
|---|---|---|---|
| | | | . . because I wouldn't know I would have to stay late until after my tour of duty." |
| #3 – 148:23-149:8 | And my question is, what is the basis for that understanding? How did you learn that? | . . . with the understanding that patients have the right to choose their providers, so if they did not want to transfer, you could ... | *Answer is incorrect and cut off by VA counsel interruption*. ". . . , they could stay in my clinic." |
| #4 – 162:12-16 | Has your supervisor, has Karel, ever told you that she wants to know when you are running behind on appointments? | No. The exact opposite. She told me to stop sending her those emails. | *Answer is incomplete.* "She told me to stop sending her those e-mails about working overtime." |
| #5 – 36:4-7 | Q. Did you ever provide it to counsel?<br>A. No.<br>Q. Why not? | They didn't ask me for it. | *Answer was incomplete. Add new sentence:* "I did not tell them about it." |
| #6 – 128:10-14 | Q. Were you asked to review any written responses before you signed this verification?<br>A. Written responses from whom?<br>Q. Prepared by counsel. | A. No. | *Answer was incorrect.* "I was sent something to review while I was on vacation. I reviewed it, I agreed with it, I signed it and my sister faxed it to my lawyers." |
| #7 – 131:13-16 and 132:1-3, 5 & 15 | | | HOLD OPEN |
| #8 – 210:1-3 | Did anyone ever ask you to search for documents related to your claims in this case? | No. | *Misunderstood reference in question to "anyone" as excluding my lawyers.* "No. But my lawyers did." |
| #9 – 210:15-18 | But you never were expressly asked to hand over whatever you had in your possession that was related to the case? | No. | *Answer is incorrect.* "Yes. I was asked to turn over any communications, records, policies or documents to my lawyers." |
| #10 – 138:20-25 | . . . was it ever your | No. | *Answer was* |

| | | | |
|---|---|---|---|
| | understanding that Karel Raneri-Vitale required you to work any time beyond your normal tour of duty to manage View Alerts or electronic patient health records? | | *incomplete.* "No, because she isn't an NP, she does mental health, she doesn't understand what view alerts are." |
| #11 – 139:21-25 | Did Dr. Leung ever induce you to work any time beyond your normal tour of duty to manage View Alerts or electronic patient health records? | No. | *Answer is incorrect:* "Yes. By setting the policies of when patients must be notified of results, complete note and encounter forms within specified time periods, respond to secure messages within a specified time period. There are issues of patient safety that require timely review of and action on the alerts, not to mention the potential effect on my license. And, someone could die." |
| #12 – 145:3-8 | Did Karel ever threaten you in any way with a negative action if you did not work beyond your normal tour of duty to attend to View Alerts or electronic patient health records? | No. | *Answer is incomplete.* "No, not verbally." |

As the Court can see, Questions 1-3 are where the VA's counsel actually cut off Ms. Plageman in mid-sentence, and Ms. Plageman in the errata sheet took the opportunity to finish her sentence. Question 4 involves a minor issue that needs no further development. Questions 5-9 involve a misunderstanding about communications Ms. Plageman had about her own lawyers

as to discovery issues. Ms. Plageman clarifies that she read and signed her interrogatory answers, and gave her lawyers all documentary evidence that she had about her claim.[4]

The VA, at page 4, fn. 4 of the present Motion (Doc. #117), admits that "the changes [as to pre-deposition discovery]. . . are not likely to be referenced in plaintiffs' motion for class certification." Plaintiffs agree with that point, and note that the VA retains the right to take Ms. Plageman's deposition again, in discovery on the merits of the case. The deposition at issue, after all, was done as part of class discovery, and its scope was so limited. If most of Ms. Plageman's changes "are not likely to be referenced in plaintiffs' motion for class certification," then plaintiffs have a hard time understanding why the VA needs to re-open her deposition now, when it can always re-take Ms. Plageman's deposition on the merits after the class issue has been decided.

Questions 10-12 do involve substantive changes to the testimony, although the change to Question 10 seems picayune, and not germane to any class issue. Thus, in all candor, this whole motion is about the change Ms. Plageman has made to Question 11, as to whether Dr. Leung had "induced" Ms. Plageman to work after her tour of duty.

**ARGUMENT**

This Court should deny the VA's motion for leave to re-depose Ms. Deborah Plageman, and for costs, because (1) defendant had ample opportunity to obtain the information by

[4] Question 7 pertains to a notation of "Hold open" that was included in the errata sheet. As Counsel has explained both to VA counsel and to the Court, "Hold open" was a notation that the attorneys added to the errata sheet, after Ms. Plageman had indicated she wanted some time to think about her original responses. Ms. Plageman concluded that the original responses were full and complete, and made no changes to her testimony. Through an oversight, the "Hold open" notations were not removed. In other words, Ms. Plageman has not changed her answer to these questions.

discovery, (2) the changed answers do not render her deposition incomplete or useless, and because (3) the burden and expense of a reexamination outweighs its likely benefit.

RCFC 30(a)(2)(A)(ii) requires a party to obtain leave of court to depose a witness if the witness has already been deposed, and the parties have not stipulated to the deposition. "[A]nd the court must grant leave to the extent consistent with RCFC 26(b)(1) and (2)." RCFC 30(a)(2). Under RCFC 26(b)(2)(C), the court must limit discovery if it determines that the party seeking discovery has had ample opportunity to obtain the information, or if it determines that the burden or expense of the proposed discovery outweighs its likely benefit.

RCFC 30(e) expressly permits a deponent to change the substance of her answers if she signs a statement listing the changes and the reasons for making them, and changed answers of any sort are permissible, even those that are contradictory or unconvincing. *Luhman v. Dalkon Shield Claimants Trust*, 1994 U.S. Dist. LEXIS 14203, (D. Kan. Oct. 3, 1994); *accord Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F. Supp. 1398 (N.D. Ill. 1993) (Rule 30(e) allows witness to change testimony even to contradict original testimony so long as he provides a reason); *United States ex rel. Burch v. Piqua Engineering, Inc.*, 152 F.R.D. 565, 566-567 (S.D. Ohio 1993) (Rule 30(e) permits "changed deposition answers of any sort . . ., even those which are contradictory or unconvincing"); *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981) ("language of the rule places no limitations on the types of changes that may be made by a witness"); *Allen & Co. v. Occidental Petroleum Corporation*, 49 F.R.D. 337, 340 (S.D.N.Y. 1970) ("cases construing [Rule 30(e)] are clear that the witness may make changes of any nature, no matter how fundamental or substantial").

"The standard to reopen a deposition is whether the changes contained in the errata sheets 'make the deposition incomplete or useless without further testimony.'" *Bay State HMO Mgt. v.*

*Tingley Sys.*, 1995 U.S. Dist. LEXIS 22279, at *68 (D. Mass.) (quoting *Sanford v. CBS, Inc.*, 594 F. Supp. 713, 715 (N.D. Ill. 1984)). If the changes have made the deposition "incomplete or useless," the party who took the deposition can reopen the examination, and can ask questions made necessary by the changed answers, questions about why the changes were made, and questions about whether the changes originated with the deponent or with her attorney. *Lugtig v. Thomas*, 89 F.R.D. 639, 642 (N.D. Ill. 1981) (citing *Erstad v. Curtis Bay Towing Co.*, 28 F.R.D. 583 (D. Md. 1961).

Allowing a witness to change her deposition eliminates the possibility for discrepancies between deposition and trial testimony, and it reduces the possibility for surprise at trial. *Lugtig*, at 641. The original answer to deposition questions remains part of the record, and can be read at trial, making it less likely that Rule 30(e) will be abused where the deponent knows the original answers, as well as the changes and the reasons therefor, will be subject to examination. *Id*.

**I. The Defendant Had Ample Opportunity to Obtain the Information Under RCFC 26(b)(2)(C)(ii) Where the Deponent's Changes Were Required Because Her Answer was Interrupted.**

Under RCFC 26(b)(2)(C)(ii), the court must limit discovery if it determines that the party seeking discovery has had ample opportunity to obtain the information by discovery in the action.

The VA seeks to re-depose Ms. Plageman regarding changes she made to her testimony that were required because her original answer was interrupted. For example, with Question 1 above, Ms. Plageman was responding to defendant's question as to why she did not feel comfortable asking that her acute patients be transferred to another provider. While she was still answering the question, defense counsel interrupted with another question. *See* Transcript of

Deborah Plageman ("Transcript"), 30:20-25 and 31:1-7. VA counsel interrupted Ms. Plageman again as to Questions 2 and 3. *See* Transcript, 142:17-24 & 149:1-12.

Where defense counsel interrupted the answer, there was ample opportunity to obtain the information by simply permitting Ms. Plageman to finish answering before posing another question. Instead, counsel interrupted and cut her off, thereby waiving defendant's right to re-depose Ms. Plageman as to those questions and changed answers.

**II. The Changes Contained in Ms. Plageman's Errata Sheets Do Not Make Her Deposition Incomplete or Useless Without Further Testimony.**

"The standard to reopen a deposition is whether the changes contained in the errata sheets 'make the deposition incomplete or useless without further testimony.'" *Bay State HMO Mgt. v. Tingley Sys.*, 1995 U.S. Dist. LEXIS 22279, at *68 (D. Mass.)

The VA seeks to re-depose Ms. Plageman regarding changed answers that do not "make the deposition incomplete or useless without further testimony." Rather, many of Ms. Plageman's changes accomplished just the opposite by making her answers more complete and her deposition more useful. As to Question 5, for example, Ms. Plageman originally answered only that she did not provide a document to her attorneys because the attorneys had not asked for it; she changed her answer to add that "[she] did not tell [the attorneys] about it" either. Transcript, 36:4-7.

As to Question 6, Ms. Plageman originally answered "No" when asked whether she reviewed written responses to interrogatories before signing the verification. Her original answer was incorrect, so she changed her answer to one indicating that she reviewed the responses, agreed with them, and signed the verification. This change does not make her testimony incomplete or useless so as to permit defendant to reopen the examination. Rather, by

correcting a mistaken answer, this change makes Ms. Plageman's testimony more complete and therefore more useful.

The same can be said for the changes Ms. Plageman made as to Questions 8-10. The changes made to these portions of the deposition clarify and expand on Ms. Plageman's original answers, making her deposition more complete and therefore more useful.

As noted above, however, the VA admits that "the changes . . . are not likely to be referenced in plaintiffs' motion for class certification." Doc. #117, p. 4, fn. 4. The VA already has the right to take Ms. Plageman's deposition again later, in discovery on the merits of the case. *This* deposition was done as part of class discovery, and its scope was so limited. If Ms. Plageman's changes "are not likely to be referenced in plaintiffs' motion for class certification," then the VA can address these issues when it takes Ms. Plageman's deposition on the merits after the class issue has been decided.

## III. The Burden and Expense of Reexamining Ms. Plageman Regarding Two Changed Answers Outweighs Its Likely Benefit.

Under RCFC 26(b)(2)(C)(iii), the court must limit discovery if it determines that the burden or expense of the proposed discovery outweighs its likely benefit.

The arguments presented above address all but two of the changed answers for which defense counsel seeks to re-depose Ms. Plageman, and the burden and expense of a reexamination as to those two changes outweighs its likely benefit. Specifically, the changed answers to Questions 11 and 12 (Transcript, 39:25 & 145:8), might have inspired immediate follow-up questions if answered that way during the deposition.

Questions 11 and 12 involve what Dr. Leung and Karel Raneri-Vitale may have done to "induce" Ms. Plageman to work beyond her tour of duty or to "threaten" her if she did not. Dr. Leung was director of primary care at the VA hospital in Manhattan, but he was not Ms.

Plageman's supervisor, nor did he have any authority to approve her overtime requests. Transcript, 104:11-21. But in any event, Ms. Plageman in her deposition went into great length about the issues that she raised when she changed her answer to Question 11 in the errata sheet:

> A. I love my job. I love taking care of these vets, particularly in mental health, because they tend to be a disenfranchised patient population.
>
> Q. Take your time.
>
> A. I myself, along with other NPs at my facility, stay often after hours and come in on the weekends to finish our work, because we really care about these veterans. We want to provide safe, comprehensive, efficient care to these patients, particularly in my own department in mental health, because a lot of these patients don't have the capacity to comprehend how important some of these issues are: A lung mass, that they don't really fully understand the importance of timely workup of these issues for potentially malignant cause.
>
> There is a ton of paperwork, there is a ton of alerts. I get two and three copies of the same lab results, and occasionally there are different results within each one. I have to look at every single one to make sure that I am providing safe care to veterans, and I'm not overlooking something.
>
> The VA has this push towards same-day access. In the mental health, it has been that way since I started; that there is a time frame you need to see people, because they are high risk patients.
>
> I have been recognized by Dr. Leung and other people for same-day access. It's built into my schedule, a certain number of appointments for that purpose, three appointments a day. Most of the time I fill those.
>
> Ms. Punla, for example, works in the hepatitis C clinic. She stays late often. We take a bus out of the Port Authority, and I have met her late at night there because she has been working late also.
>
> And we should be compensated according to the VA policy that we are hourly employees. If that's the case, we should be compensated for the work that we are doing: Providing excellent care to these veterans.

> That is what the VA is here to provide, is good, comprehensive care to veterans in a timely manner, and we are doing that, but we are not being paid for it.

Transcript, 117:10-119:8. Similarly, Ms. Plageman was asked about inducement:

> Q. What is your understanding of the meaning of inducement in the context of your claim against the government?
>
> A. Inducement of overtime means that there are alerts that need to be followed up both by the VA policy, but also for good healthcare within a certain time frame, and in order to do that within that time frame, if it falls outside of our work time, that's induced overtime. I have to stay there. I get a high alert lab lung nodule, I need to follow up on that within a certain time frame that is very tight. If I can't accomplish that during my tour of duty because I, A, can't reach the patient, or whatever the reason, then I need to make sure that that gets followed up within a time frame, both for a patient safety issue, a quality of care issue, and complying with the VA policy.

Transcript, 118:7-119-1. And Ms. Plageman explained Dr. Leung's role in the process:

> Q. Was it ever your understanding that Joe Leung expected you to work any time beyond your normal tour of duty to manage View Alerts or electronic patient health records?
>
> A. Yes.
>
> Q. What is the basis of that understanding?
>
> A. That it is expected of me as a primary care nurse practitioner to timely address labs, diagnostic test results, documentation, to comply with and fulfill my duties as a nurse practitioner to provide safe and effective health care to the veterans.
>
> Q. And was it ever your understanding that Joe Leung did not believe that you should be paid or compensated for working time beyond your normal tour of duty to manage View Alerts or electronic patient health records?
>
> A. There was -- no -- can you repeat that last question?
>
> Q. Sure. Was it ever your understanding that Joe Leung expected you to work time beyond your normal tour of duty to manage View

Alerts or electronic patient health records without receiving compensation?

A. No.

Q. How was Joe Leung's expectation communicated to you, if at all?

A. Through meetings and VA policy.

Q. When you say through meetings, what meetings?

A. Through their -- there are primary care meetings, there is medical director meetings.

Q. At those meetings, who communicated that it was Dr. Leung's expectation that you work beyond your normal tour of duty to manage View Alerts or electronic patient health records?

A. It was not specifically addressed that I as an individual should be staying late to address patient issues. Those words were never spoken.

Q. I asked you how the expectation that you had to work overtime to attend to or manage View Alerts and electronic patient health records was communicated to you, and you said it was communicated in meetings.

A. In meetings and through VA policies.

Q. And so I am asking you, in those meetings, what was communicated to you that gave you a basis to reach the conclusion that there was an expectation that you had to work overtime to attend to View Alerts and electronic patient health records?

A. Reviewing the policy and the timeline of completion of encounter forms notes, and to communicate lab results to patients.

Q. And what policy?

A. The VHA health care policy that says encounters must be completed within one day.

Q. And why do you associate the policies that you are referencing with Dr. Leung's expectation?

> A. Because as the primary care director, it is also his responsibility to make sure all primary care providers comply with the policy and provide safe and effective health care.

The VA, in other words, covered these issues at length, over a full day of deposing Ms. Plageman. Her change to her response to Question 11 is entirely in line with her prior testimony. There is little benefit to re-opening a deposition, when the issues have been fully covered.

Similarly, Ms. Raneri-Vitale is a registered nurse and Ms. Plageman's supervisor, at least to the extent that Ms. Raneri-Vitale must sign off on her requests for overtime. Transcript 54:7-13. As to any "threats" that Ms. Raneri-Vitale made, VA counsel cross-examined Ms. Plageman about retaliation and down-grading her performance review at Transcript, pages 19-27. The issue in Question 12, then, was covered at length in the original deposition.

The cost of travel, lodging, meals, and a stenographer clearly outweigh the benefit of having Ms. Plageman answer follow-up questions in person, as to issues that either have been covered at length in the deposition or are unlikely to arise in the class certification motion.

**CONCLUSION**

Having set Plaintiffs on a wild goose chase in class discovery about what information the VA's computers contained, and costing Plaintiffs multiple thousands of dollars, the VA wants *Plaintiffs to fund an unnecessary overnight trip to New York for two lawyers, so that they can spend 20 minutes following up on a limited line of questioning, on issues that the VA admits are unlikely to come up in the class certification motion.* Therefore, plaintiffs respectfully request that defendant's Motion for Leave to Re-Depose Deborah Plageman and For Costs be denied.

Dated: August 18, 2017

Respectfully submitted,

/s/ David M. Cook
David M. Cook
**COOK & LOGOTHETIS, LLC**
30 Garfield Place, Suite 540
Cincinnati, Ohio 45202
513.287.6980 – phone
513.721.1178 – fax
dcook@econjustice.com
*Attorney of Record for Plaintiffs*

William Michael Hamilton
**PROVOST UMPHREY LAW FIRM LLP**
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
615.297.1932 – phone
615.297.1986 – fax
mhamilton@provostumphrey.com
*Of Counsel for Plaintiffs*

Clement L. Tsao
**COOK & LOGOTHETIS, LLC**
30 Garfield Place, Suite 540
Cincinnati, Ohio 45202
513.287.6987 – phone
513.721.1178 – fax
ctsao@econjustice.com
*Of Counsel for Plaintiffs*

Guy Fisher
**PROVOST UMPRHEY LAW FIRM LLP**
490 Park Street
Beaumont, Texas 77701
409.203.5030 – phone
409.838.8888 – fax
gfisher@provostumphrey.com
*Of Counsel for Plaintiffs*

Robert H. Stropp, Jr.
**MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.** 836
1920 L. Street, NW, Suite 400
Washington, DC 20036
202.783.0010 – phone
202.783.6088 – fax
rstropp@hotmail.com
*Of Counsel for Plaintiffs*

E. Douglas Richards
**E. DOUGLAS RICHARDS, PSC**
Chevy Chase Plaza
Euclid Avenue, Suite 321
Lexington, Kentucky 40502
859.259.4983 – phone
866.249.5128 – fax
edrichards714@yahoo.com
*Of Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties.

/s/ David M. Cook
David M. Cook